**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| **United States of America,** | * | |
| | * | |
| **Plaintiff,** | * | **CASE NO.** |
| | * | |
| **v.** | * | |
| | * | |
| **Zakhraula Murtuzalieva,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**DECLARATION OF GEHRIG HARRIS, MD**

I, Gehrig Harris MD, hereby declare:

1. I am a Family Medicine Doctor and serve as the assigned Clinical Director of the Stewart Detention Center, Lumpkin, Georgia. My duties include providing medical care for undocumented aliens detained at the facility. I have been employed at Stewart Detention Center since April of 2020.

2. I am familiar with the case of Zakhraula Murtuzalieva. I am the supervising physician for the Respondent, and I make this declaration upon a review of the patient's records, my examination, and discussions with the treating medical staff.

3. This affidavit is made in support of the petition by the Department of Homeland Security to obtain a court order for involuntary hydration, nutrition, and medication through an intravenous line for the detainee on hunger strike to prevent further deterioration of the detainee.

**Zakhraula Murtuzalieva**

4. Zakhraula Murtuzalieva is a 26-year-old female who has been detained at the Stewart Detention Center pending removal from the United States. She is a native and citizen of Russia.

5. Ms. Murtuzalieva speaks some English but primary Russian. At all times, the medical staff and me used the language line at the facility to speak to Ms. Murtuzalieva through an interpreter.

6. Ms. Murtuzalieva has no known significant past medical history. She is currently prescribed hydroxyzine and venlafaxine for her anxiety disorder, and she has been regularly taking these medications. She has also been prescribed Zofran recently for nausea which she refuses to take.

7. Ms. Murtuzalieva is on a self-imposed hunger strike; her last meal was on August 17, 2024. To date, Ms. Murtuzalieva has missed 26 meals, including breakfast on August 26, 2024. Her refusal to eat is based on her discontent with ICE and dissatisfaction with the progress of her immigration case.

8. Ms. Murtuzalieva (142.5 lbs.) has lost a total of 19.9 pounds since August 15, 2024 (162.4 lbs.), approximately 12% of baseline body weight during her hunger strike.

9. As of August 26, 2024, Ms. Murtuzalieva’s blood pressure was 105/64 and her heart rate was 105.

10. Ms. Murtuzalieva’s current physical condition is that she is very weak, tachycardic, ataxic, and suffering from low blood pressure.

11. Unfortunately, Ms. Murtuzalieva refuses to eat and refuses hydration/nutrition through an intravenous line. She also refuses to consume any fluids orally that could provide nutritional value, such an electrolyte liquid or meal replacement liquid.

12. Ms. Murtuzalieva has been evaluated by the mental health team. Though Ms. Murtuzalieva came into the facility with a mental health diagnosis of anxiety disorder, she is currently taking those medications and medical and mental staff do not believe her refusal to eat is based on her mental health condition.

<u>The effect of a hunger strike on the human body</u>

13. It is difficult to predict for how long the human body can survive without food, and if an individual does not have adequate fat stored, this time decreases significantly. If an individual goes without water for approximately eight to ten days, she will suffer from dementia, delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

14. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization.

15. Medical literature reflects that metabolic imbalance caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reached 18% of the patient's initial weight.

16. The medical staff has explained to the detainee the medical necessity to eat and drink to preserve her health and the medical risks incurred during a hunger strike. Other staff members have repeatedly talked to the detainee in attempts to convince her to

eat solid foods and/or a liquid diet. However, the detainee continues to refuse to resume eating.

17. I have personally explained to the detainee my concerns regarding her condition and the medical risks involved with a continued lack of inappropriate nourishment. That is, she risks significant metabolic changes induced by a decreased nutritional intake. If she continues to be on a hunger strike, she will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to her kidneys, liver, heart failure and the risk of death.

18. I have counseled the detainee about the effects of self-imposed dehydration and starvation on the body. I have also informed her of involuntary hydration and feeding procedures that will be done to prevent injury and or death to her should she continue not to eat.

19. In my professional medical judgment, should she decide to continue the hunger strike, she will reach a point where she will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to her internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated will cause fatal arrhythmia or cardiac arrest. She currently needs hydration, nutrition, and medication through an intravenous line and it may become necessary to feed her a nutritional supplement through a nasogastric tube to provide her the nutrition she needs. If her laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously.

20. During the first three days of a hunger strike, the body will start using glycogen storage in an effort to maintain glucose levels. This storage will rarely last more than 72 hours. Between day 4 and day 13, the brain and red blood cells require glucose as an energy source, and in view of depletion of glycogen storage, the body will start obtaining glucose from non-carbohydrate sources (for example muscle protein) and fatty acids. In this phase the body will experience loss of body fat, protein and total body electrolytes such as potassium, phosphate and magnesium. The body will maintain the serum electrolyte levels at the expense of intracellular stores. Between day 14 and day 34 thiamine deficiency occurs.

21. In my professional medical judgment, it is necessary to obtain a court order to require involuntary hydration, nutrition, and medication through an intravenous line.

22. In order to ensure the patient's medical safety, should the detainee refuse to cooperate with the deployment of an intravenous line, medical soft restraints will be required to immobilize the detainee and prevent unnecessary injury to both the detainee and medical staff.

23. In light of the detainee's hunger strike and refusal of medical care, in my professional judgment, it is medically necessary to obtain court orders for the abovementioned procedures to monitor the detainee's physical condition and ensure her health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of August, 2024.

**/s/ Gehrig Harris MD**

Gehrig Harris MD

Board Certified Family Medicine

Clinical Director

Stewart Detention Center

Lumpkin, Georgia