IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | :    Case No. 4:24-CV-00118 |
| ZAKHRAULA MURTUZALIEVA, | : |
| Defendant. | : |

**EMERGENCY MOTION FOR ORDER OF
AUTHORIZATION AND MEMORANDUM IN SUPPORT**

COMES NOW, Plaintiff United States of America, by and through the United States Attorney for the Middle District of Georgia, and hereby respectfully moves the Court for an order, pursuant to 28 U.S.C. § 1651, authorizing the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), acting through the Stewart Detention Center ("SDC") and contract medical personnel, to involuntarily administer fluids and medications through an intravenous line to Defendant Zakhraula Murtuzalieva at SDC in Lumpkin, Georgia. Restraints may be needed to accomplish this involuntary treatment. In support of this motion, Plaintiff relies on the below memorandum.

Defendant is a Russian national who is detained post-final order of removal while awaiting removal to Russia and is currently detained by ICE in Lumpkin, Georgia at SDC. Defendant is currently engaged in a hunger strike, during which she is refusing nutrients necessary to sustain her life. Defendant is also refusing to cooperate with the medical staff at SDC, to wit: she is refusing nutrients and medication necessary to sustain her life. See Declaration of Dr. Gehrig Harris, D.O. ("Harris Decl.").

Defendant Zakhraula Murtuzalieva is a 26-year old native and citizen of Russia. On January 23, 2024, she was issued a Notice to Appear charging her with removability. On July 10, 2024, an immigration judge ordered her removed to Russia. She awaits removal from the United States.

Defendant Murtuzalieva has missed 26 consecutive meals. She continues to refuse to eat. Defendant also refuses to comply with SDC medical staff's treatment efforts. Defendant refuses to consume fluids to provide nutritional value and refuses hydration and medications administered through an intravenous line.

## STATEMENT OF THE CASE

Plaintiff has made reasonable efforts to persuade Defendant to discontinue her hunger strike, to no avail. See Attached Declaration of Supervisory Detention and Deportation Officer Adam Orlandella ("Orlandella Decl."). As SDDO Orlandella notes in his declaration:

1. Since Murtuzalieva began her hunger strike, the SDC and SDC staff, through a Russian interpreter, have attempted to convince her to end the hunger strike and begin eating food and consuming adequate water. It has been explained to Murtuzalieva, through a Russian interpreter, that, if she continues the hunger strike, his health will be seriously jeopardized, and she may eventually die.

2. At the SDC, the personnel, through a Russian interpreter, have informed Murtuzalieva that if she continues his hunger strike it may become necessary to seek a court order to involuntarily examine and test her, and administer food or hydration to save her life.

3. In addition to ICE's paramount concerns about the health and wellbeing of ICE detainees, the death or injury of any detainee as a result of a hunger strike would also seriously affect the operations of ICE at the SDC and SDC and adversely affect ICE efforts to maintain the safety, security and good order of the detention facility for the detainees, staff, contractors, volunteers, and visitors therein in the following ways:

    a. My foremost obligation is to maintain the safety and security of the ICE detainees housed at the facility and provide for the health and well-being of the detainees, which includes protection from self-harm. A facility cannot stand by and fail to intervene in self-injurious behavior that is completely antithetical to our mission of maintaining the health and safety of noncitizens under our care.

b.  Moreover, other detainees may engage in hunger strikes, whether or not with the intention of committing suicide by starving themselves to death. For a detainee to cause his own death without staff intervention would completely undermine the DHS's obligation to render appropriate medical care and prevent detainee suicides.

c.  In addition to critical personal health and safety for each individual, general security and order in the facility can also be destabilized by hunger strikes, which risks harm to other persons in the facility, including detainees, staff, contractors, volunteers, and visitors. Perceptions may be formed by the ICE detained population that ICE will simply let a detainee die, without intervening to save him or her, which could lead to lowered morale, resentment, acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the facility. I am concerned that hunger strikes, and even other acts of a disruptive or violent nature, would be directed at staff and other providers, to express detainee anger, resentment, and frustration.

d.  If such disruptive acts were to occur, tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

e.  Other detainees may decide that they have lost confidence in the skills, ability, or willingness of medical staff at the facility to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

f.  Detainees who participate in hunger strikes may severely and permanently damage their health. This may also require immediate and long-term medical care which in turn may require DHS to unnecessarily divert and expend its limited resources when such action can be avoided with appropriate medical intervention.

g.  In the absence of an adequate response to life-threatening hunger strikes, other detainees may participate in such activities in an attempt to change facility operations or exact concessions from facility management, rather than using other available means that do not threaten their health and wellbeing. For example, Detainees may initiate hunger strikes to pressure staff to transfer them away from the facility, or to gain their release from detention. Without the ability to intervene when medically necessary, the facility will be forced to choose between letting the detainee die and giving in to their demands. ICE supports detainees' ability to express concerns about their cases, and an array of options – short of life-threatening hunger strikes – is available to them, including:

   i.  Pursuit of applications for relief and protection from removal in proceedings before a neutral immigration judge;

      ii. Submission of facility-specific informal and formal grievances (including emergency grievance processes and appeal processes) relating to any aspect of their detention, including medical care, which trigger prompt responses;

     iii. Submission of the online ERO Contact Form on the detainees' behalf by stakeholders, including interested individuals, nongovernmental organizations, faith-based organizations, and advocacy groups;

     iv. Complaints to oversight entities within the Department of Homeland Security, including the Office of Inspector General, Office for Civil Rights and Civil Liberties, Office of Detention Ombudsman, as well as the ICE Office of Professional Responsibility; and

      v. Use of the Detention Reporting and Information Line, a toll-free service that provides a direct channel for detainees, family members, private attorneys, and other stakeholders to communicate directly with ICE ERO about detainee allegations and concerns.

h. Some detainees may merely voice threats to go on a hunger strike, diverting additional staff attention away from other detainees.

i. If a detainee is permitted to die from self-starvation, public perception of DHS and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

Without the necessary fluids and medications, Defendant's life is in danger. See Harris Decl.

As noted in the declaration of Dr. Gehrig Harris, D.O., Defendant has missed 26 meals and has not consumed food since lunch on August 17, 2024. Dr. Harris has declared that Defendant requires immediate involuntary medical intervention to prevent further deterioration and serious medical complications, and if involuntary hydration is required, it will be necessary to provide the required hydration intravenously. See id.

## LAW AND ANALYSIS

Defendant is in the lawful custody of the ICE pursuant to INA § 241, 8 U.S.C. § 1241. Her legal status insofar as detention is concerned is likened to that of a pretrial detainee since Defendant is not being held pursuant to a sentence of incarceration for the commission of a crime. Bell v. Wolfish, 441 U.S. 520 (1979). As her custodian, ICE is responsible for providing Defendant with

such basic necessitates as food, living space, and medical care that is consistent with the due process clause. Hamm v. Dekalb County, 774 F.2d 1567, 1572 (11th Cir.), cert. denied, 475 U.S. 1096 (1985).

A competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment. Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261 (1990); Sullivan v. Bornemann, 384 F.3d 372 (7th Cir. 2004). However, Defendant's interest in refusing medication must be balanced against ICE's legitimate and necessary interest in safety and security.

In the specific context of an alien in immigration detention, a district court in the Northern District of Alabama entered an order authorizing the former Immigration and Naturalization Service to force feed an INS detainee. In Re Soliman, 134 F. Supp. 2d 1238 (N.D. Ala. 2001), vacated on grounds of mootness, Soliman v. United States, 296 F.3d 1237 (11th Cir. 2002).[1] Faced with a First Amendment challenge by Mr. Soliman, the district court engaged in a lengthy analysis and noted the Government's interest in the preservation of life. Id. at 1253. Second, the court found that Soliman had alternative means of protesting his detention, which included correspondence, telephone calls, and contacts with the media. Id. Finally, the district court found that force feeding was not an "exaggerated response" to penal concerns because it was the only way to sustain the life of a hunger striking detainee. Id. at 1254. The court concluded that the Government's limitations on Soliman's First Amendment rights were reasonable. Id.

---

[1] Plaintiff relies on the district court's Soliman decision as persuasive authority only. Indeed, a district court is not bound by another district court's decision, or even an opinion by another judge of the same district court. Fox v. Acadia State Bank, 937 F.2d 1566, 1570 (11th Cir. 1991). Soliman appealed the district court's order to the Court of Appeals for the Eleventh Circuit. While his appeal was pending, he was removed to Egypt. Soliman v. United States, 296 F.3d at 1241-42. The Eleventh Circuit concluded that the case was moot due to his removal, since he was no longer in detention, and was no longer being force-fed by the INS. Id. at 1243. The appellate court dismissed the appeal, and vacated the district court's order. Id. at 1243-44.

The district court also analyzed the Government's action in force-feeding Soliman in terms of the right to privacy. Id. at 1254-58. The court reviewed the cases cited by Soliman, including In Re Grand Jury Subpoena John Doe; In Re Sanchez, 134 F. Supp. 2d at 1255-56, as well as state court decisions upholding the right to force-feed hunger striking prisoners, White v.Narick, 292 S.E.2d 54 (1982) and Von Holden v. Chapman, 450 N.Y.S.2d 623 (N.Y.App.Div. 1982), 134 F. Supp. 2d at 1256-57. The district court concluded that the interests asserted by the Government – maintenance of order and safety in the detention facility, preservation of life, and the onerous administrative burden presented by a hunger-striking detainee – were legitimate penological objectives. Id. at 1258. Further, the court found that force-feeding Soliman was warranted, so long as only nasogastric tube or intravenous feeding procedures were employed. Id. at 1259.

To determine whether a detainee's substantive due process rights have been met, the court must assess: 1) whether there exists a "valid, rational connection" between the government's legitimate interests and its act of forcibly treating the detainee; 2) how and to what extent facility resources, facility staff, and other detainees will be adversely affected if the detainee is permitted to refuse his prescribed treatment; and 3) whether the interests of the state and others reasonably could be protected by means other than forced treatment. See Washington v. Harper, 494 U.S. 210, 221-22 (1990) (citing Vitek v. Jones, 445 U.S. 480, 491-94 (1980); Youngberg v. Romeo, 457 U.S. 307, 316 (1982); Parham v. J. R., 442 U.S. 584, 600-01 (1979)). The government also has an interest in providing and is required to provide necessary medical care for detainees housed within its facilities.

The majority of courts have considered similar issues relating to the force-feeding of a person in custody. Those courts have upheld the constitutionality of doing so, pointing out

6

numerous governmental interests that are advanced by the force-feeding and the thwarting of hunger strikes. Contrary decisions are fact-dependent on the particular circumstances and are not pertinent here. See In re Grand Jury Subpoena John Doe v. United States, 150 F.3d 170 (a force-feeding order did not violate constitutional rights when weighed against the state's interests in preserving life, prevention of suicide, and enforcement of prison security, order and discipline); Garza v. Carlson, 877 F.2d 14 (8th Cir. 1989) (affirming the right of prison officials after a court hearing to force-feed prisoner on a hunger strike); In re Sanchez, 577 F. Supp. 7 (S.D.N.Y. 1983) (extra attention required to deal with hunger striker creates administrative burden); Laurie v. Senecal, 666 A.2d 806 (R.I. 1995) (prisoner has no right to commit suicide through starvation); State v. Vogel, 537 N.W.2d 358 (N.D. 1995) (courts cannot condone manipulation of medical circumstances to detriment of state's interests, and force-feeding is reasonably related to legitimate interests in order, security, and discipline).

There are no federal cases that hold that a prison inmate or detainee has a right to die, that is, to commit suicide by starvation. Rather, the United States Supreme Court has specifically held that there is no right to commit suicide. Washington v. Glucksburg, 521 U.S. 702, 728 (1997).

### The Effects on the Institution

SDDO Orlandella's concerns about the adverse effects on SDC are very real. Cleavenger v. Saxner, 474 U.S. 193, 194-96 (1985), provides a real-life example where, after an inmate's death at the institution hospital, inmates engaged in a work stoppage to protest his death because of their perceptions of the institutions' medical care.

In addition, there are very real concerns about such events fostering litigation, win or lose. In Geter v. Wille, 846 F.2d 1352 (11th Cir. 1998), the mother of a prisoner who starved himself to death sued for damages. The named defendants were found liable in a jury trial and compensatory

and punitive damages totaling $150,000 were awarded. The Eleventh Circuit ultimately reversed the verdict for lack of personal involvement, but the defendants had to undergo a trial where their time and attentions were drawn away from their regular duties. They also had to suffer under the personal stresses created by an improper verdict and award. As explained by the Eleventh Circuit, "[t]he jury, apparently consumed by this misfortune, wanted to make someone pay for what happened to Geter." It is perhaps only natural that an inmate's loved ones will feel that medical care has been improper and that there was something the medical staff could have done to save the inmate's life.

SDDO Orlandella's other concerns have validity as well, and his judgment is entitled to deference from the Court. The Supreme Court has repeatedly held that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated (or, in this case, lawfully detained) persons retain only a very narrow range of protected liberty interests. Hewitt v. Helms, 459 U.S. 460, 467 (1983). Broad discretionary authority is necessary because the administration of a detention center is, at best, an extraordinary difficult undertaking. Courts should not be too ready to exercise oversight and put aside the judgment of administrators. Wolff v. McDonnell, 418 U.S. 539 (1974).

A warden or administrator has a responsibility to maintain order and safety. Accordingly, discretion is granted in the implementation of policies which further these goals. Bell v. Wolfish, 441 U.S. 520, 546 (1979). Wardens and administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that, in their judgment, are needed to maintain institution security. Id. at 547. When the action taken appears to be a rational response to a security problem and there is no evidence that the response is exaggerated, a court will not second guess a prison official. Id.; see also, Turner v. Safely, 482 U.S. 78 (1987) (regulation is valid if it

8

is rationally related to legitimate penological interests). Staff must act and react to situations occurring in correctional and detention institutions on the basis of imperfect information, making judgments about how various events will affect their institutions and inmates and staff within them.

Although prisoners and detainees retain some of their constitutional rights, restrictions may be made based upon legitimate goals and policies of correctional institutions. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnson, 334 U.S. 266, 285 (1948). Thus, a restriction which infringes on constitutional rights is valid if imposed for reasons of security. Bell, 441 U.S. at 546. Central to all other correctional goals is the security of the institution itself. Pell v. Procunier, 417 U.S. 817, 823 (1974). Maintaining institution security and preserving internal order and discipline justifies the limitation or retraction of the retained constitution rights of both convicted prisoners and pretrial detainees. Bell, 441 U.S. 546.

Finally, the fact of confinement and the needs of the institution impose limitations on constitutional rights of inmates, including those derived from the First Amendment. Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 125 (1977). The Supreme Court has "repeatedly recognized the need for major restrictions on prisoner's rights." Id. at 129. Prison and jail officials must be permitted to take steps to forestall threats of institution disruptions. "[T]hey must be permitted to act before the time when they can compile a dossier on the eve of a riot." Id. at 132-33, n.9.

Thus, SDDO Orlandella's concerns for ICE's ability to maintain the safety of detainees transferred to SDC, including his concerns for potential security problems if Defendant is not involuntarily administered fluids and provided with necessary medical treatment, should prevail. The Court should grant the motion in these circumstances, where the right for a detainee to commit

9

suicide by starvation or by refusing life-sustaining medical treatment has been rejected by those courts that reviewed such a claim and where the Supreme Court has not found such a right to exist.

## CONCLUSION

Accordingly, the United States prays for an order under 28 U.S.C. § 1651 authorizing ICE at SDC, through competent medical authority, to involuntarily administer fluids and medication through an intravenous line to Defendant to sustain the life of Defendant, and to restrain Defendant to accomplish the same until such time as Defendant discontinues her hunger strike or until the Court otherwise orders.

The United States respectfully attaches hereto a proposed order for the Court's consideration.

Respectfully submitted this 26th day of August, 2024.

        PETER D. LEARY
        UNITED STATES ATTORNEY

By:   *s/ Roger C. Grantham, Jr.*
      ROGER C. GRANTHAM, JR.
      Assistant United States Attorney
      Georgia Bar No. 860338
      United States Attorney's Office
      Middle District of Georgia
      P. O. Box 2568
      Columbus, Georgia 31902
      Phone: (706) 649-7728
      Email: roger.grantham@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2024, I electronically transmitted the Emergency Motion to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: N/A

I further certify that on August 26, 2024, I served the document by in-person delivery or via first class mail on the following non-CM/ECF participants:

Zakhraula Murtuzalieva
A # 249373037
c/o Stewart Detention Center
146 CCA Road
P.O. Box 248
Lumpkin, GA  31815

This 26th day of August, 2024.

                                      PETER D. LEARY
                                      UNITED STATES ATTORNEY

By:    *s/ Roger C. Grantham, Jr.*
          ROGER C. GRANTHAM, JR.
          Assistant United States Attorney
          Georgia Bar No. 860338
          United States Attorney's Office
          Middle District of Georgia
          P. O. Box 2568
          Columbus, Georgia 31902
          Phone: (706) 649-7728
          Email: roger.grantham@usdoj.gov